UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
ELIZABETH DE CHANVAL PELLIER,       :
                                    :
                   Petitioner,      :
                                    :    MEMORANDUM OPINION
     - against -                    :
                                    :
                                    :    Civil Action No.
BRITISH AIRWAYS, Plc., IRVING       :    02-CV-4195
RUDOWITZ, ROSEMARY ROGERS, DAN      :
DRISCOLL, and DOUG HUTCHESON.       :
                                    :
                   Respondents.     :
                                    :
------------------------------------X

TRAGER, J.:

        Plaintiff Elizabeth de Chanval Pellier ("Pellier") brings

this action against British Airways ("BA"), and individual BA

employees Irving Rudowitz ("Rudowitz"), Rosemary Rogers

("Rogers"), Dan Driscoll ("Driscoll") and Doug Hutcheson

("Hutcheson") (collectively, "defendants").  Pellier brings

claims against BA for acts of sex discrimination, harassment and

retaliation in violation of Title VII of the Civil Rights Act of

1964 ("Title VII").  See 42 U.S.C. § 2000e.  Pellier also brings

claims against all defendants for violations of New York State

and City civil rights laws, see N.Y. Exec. § 296 (McKinney 2005)

("NYSHRL"); New York, N.Y. Admin. Code tit. 8, ch. 1, § 8-107

(West 2004) ("NYCHRL"), for violations of New York State's

surreptitious viewing law, see N.Y. Gen. Bus. Law § 395 (McKinney

2005) ("§ 395"); for common-law intentional infliction of

emotional distress; and for "gross, willful and wanton, malice

and gross carelessness, recklessness and depraved indifference."
All defendants have moved for summary judgment on all claims
except the last.[1]

## Background

Pellier, a BA employee for nearly 30 years, was promoted to
the position of Duty Maintenance Manager ("DMM") in BA's
Engineering Department ("Engineering") at John F. Kennedy ("JFK")
International Airport in October 1997, a position she describes
as "highly regarded [and] prestigious." Pl's Mem. of Law in Opp.
to Defs' Mot. for Summ. J. ("Pl's Opp. Mem.") at 6; see Defs'
Local Rule 56.1 Statement of Material Facts ("Defs' 56.1 Stmt.")
¶¶ 7-8.[2] Pellier alleges that, during her tenure in Engineering,
other BA employees engaged in persistent and abusive
inappropriate conduct of a sexual nature. See Pl's 56.1 Stmt.

---

[1] The order issued on December 28, 2005 incorrectly
described defendants' motion as being directed at all claims.

[2] See also Plaintiff Elizabeth de Chanval Pellier's Local
Rule 56.1 Response in Opp. to Def's [sic] Mot. for Summ. J.
("Pl's 56.1 Stmt.") ¶¶ 7-9. Pellier's Rule 56.1 statement does
not specifically admit or deny the factual allegations contained
in defendants' corresponding statement. For this reason,
defendants argue that all factual allegations made in their Rule
56.1 statement should be considered admitted by Pellier. See
Defs' Reply Mem. of Law in Further Supp. of Defs' Mot. for Summ.
J. ("Defs' Reply Mem.") at 1-2; see also Gubitosi v. Kapica, 154
F.3d 30, 31 n.1 (2d Cir. 1998). However, Pellier presents
supplementary materials which raise substantial issues of fact
that should be considered, notwithstanding her inartful Rule 56.1
statement.

¶ 56.  Thereafter, Pellier requested a transfer out of Engineering and, after turning down several other positions and an early retirement package, accepted a "clerical" position within BA's World Cargo Department ("WCD") in 2002.  See Defs' App., Ex. Z; Defs' 56.1 Stmt. ¶ 24; Aff. of Pl. in Opp. to Mot. for Summ. J. ("Pellier Aff.") ¶ 45.  Pellier's claims arise from the conduct of her coworkers and subordinates during her tenure in Engineering, and from the circumstances of her subsequent transfer.

The parties' submissions suggest an essentially three-tiered employment structure at BA's Engineering facility at JFK Airport.  See Defs' 56.1 Stmt. ¶ 6.  The lowest tier was comprised of various union positions with limited or no supervisory responsibility.  See id.  The middle tier was comprised of DMMs, who were BA management employees with certain supervisory authority over the subordinate union staff.  See id. ¶ 6.  In turn, the DMMs reported to a Station Maintenance Manager ("SMM"), the apparent head of the department, with authority over all its employees.  See id. ¶ 5.[3]  During the relevant period, there were five DMMs and approximately forty-six union employees in

---

[3] Defendant Hutcheson became the SMM in charge of JFK Engineering in September 2000.  See Pl's 56.1 Stmt. ¶ 22; Defs' Local Rule 56.1 Statement of Material Facts in Response to Pl's 56.1 Stmt. ("Defs' Reply Stmt.") ¶ 22.  He was preceded in that position by William Kerr ("Kerr").  See Defs' 56.1 Stmt. ¶ 9.  Kerr is neither a party to this litigation nor relevant to its resolution.

3

Engineering.  See id. ¶ 11.

Defendant Rudowitz was BA's Senior Vice President of People and Organizational Delivery for North America, with apparent authority over all the individual parties in this litigation. See Pl's 56.1 Stmt. ¶¶ 15-16; Defs' Reply 56.1 ¶¶ 15-16. Defendant Driscoll was the Director of Labor and Employee Relations and had authority over all individuals in that department.  See Pl's 56.1 Stmt. ¶ 21; Defs' Reply 56.1 ¶ 21. Defendant Rogers, BA's Director of Human Resources, USA, was a "human resources generalist with responsibilities for the day-to-day operation of [the Human Resources] department." See Defs' 56.1 Stmt. ¶ 3; Pl's 56.1 Stmt. ¶ 28.

Pellier alleges that at some point after she began working as an Engineering DMM, various Engineering employees engaged in inappropriate conduct of a sexual nature.  See generally Pl's App. Ex. O-FFF; Pl's 56.1 Stmt. ¶ 56.  This included: posting and otherwise leaving in plain view pornographic material, some of which depicted or was directed specifically at Pellier; using BA computers to access pornographic material on the internet; downloading such material onto communal BA computers where others could view it; and viewing pornographic video cassettes and cable programs on a television located in a communal area.  Id.  Though the parties largely agree that such acts occurred, see generally Defs' Reply 56.1 ¶ 56, they present conflicting accounts of who

4

did what in response.

Pellier alleges that she complained on several occasions to Rudowitz, Rogers and Hutcheson and that they failed to take appropriate investigative or remedial steps. See Pl's Opp. Mem. at 5, 9; see, e.g., Pl's 56.1 Stmt. ¶¶ 56(a)-(f),(h),(k),(m)-(n),(t),(dd). Because of these failures, Pellier asserts that she was forced to file a complaint with the Equal Employment Opportunity Commission ("EEOC") and that, thereafter, she was subjected to further inappropriate conduct in retaliation. See id. ¶¶ 56(w),(cc)-(dd),(ff),(hh)-(ii),(qq). According to Pellier, BA continued to ineffectively respond to her complaints after she filed with the EEOC. See id. ¶¶ 56(jj),(qq),(ww)-(aaa). Pellier alleges that one response in particular, whereby several surveillance cameras were installed throughout the Engineering facility (including in Pellier's shared office), was, in fact, "an orchestrated way to capture her in an indiscreet moment." Pl's Opp. Mem. at 24; see Pl's 56.1 Stmt. ¶¶ 56(kkk), (nnn). Pellier contends that she was ultimately forced to accept a position involving "significantly diminished material responsibilities" in order to escape conditions in Engineering which she describes as "intolerable." See Pl's 56.1 Stmt. ¶¶ 56(uuu); Pl's Opp. Mem. at 7; Dep. of Elizabeth de Chanval Pellier ("Pellier Dep.") at 175.

For their part, defendants portray BA's response in a

substantially different light.  See generally Defs' Mem. at 1-3.
Specifically, defendants claim that they timely and adequately
responded to all Pellier's complaints.  See Defs' Mem. at 2, 19-
21; Defs' 56.1 Stmt. ¶¶ 73-74, 79-82, 90, 93, 111-13, 119-20,
133, 141-46.  Moreover, far from being offended, defendants
suggest that Pellier in fact approved of and engaged in the
inappropriate conduct while she worked in Engineering.  See Defs'
Mem. at 13; Defs' 56.1 Stmt. ¶¶ 151-53, 167.  They point out that
Pellier never complained until several years after she alleges
the inappropriate conduct began, and then complained for the
first time only after Hutcheson recommended a change in BA policy
that would have imposed longer shifts on the JFK DMMs.  See Defs'
Mem. at 15; Defs' 56.1 Stmt. ¶¶ 39-40.

Specifically, soon after Hutcheson arrived in Engineering,
he recommended changing the BA policy regarding the shift
requirements for DMMs.  See Defs' 56.1 Stmt. ¶ 39.  At his
recommendation, DMMs were ultimately required to work four
twelve-hour shifts per week, instead of five eight-hour shifts
per week.  Id.  In light of this, defendants contend that
Pellier's complaints were not motivated by her offense at the
inappropriate conduct, but rather manifest an attempt to avoid
the shift change, which Pellier allegedly thought would adversely
affect her health and the health of her pets.  See Defs' Mem. at
15; Defs' 56.1 Stmt. ¶¶ 42, 44-47, 52-54, 58-60.  Additional

relevant facts (and factual disputes) are discussed below.

## Discussion

To prevail at summary judgment, the moving party must show that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Only disputes about material facts that might affect the outcome of the suit will properly preclude summary judgment. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing that it is entitled to summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, where a motion for summary judgment is predicated upon the absence of proof of an essential element of a particular claim for relief, the nonmoving party must produce evidence such that a rational trier of fact could find in its favor on that element. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### (1)

### Title VII Claims

**a. Sex Discrimination**

Pellier claims that BA discriminated against her because of her sex by transferring her to the less prestigious WCD position. This claim is governed by the burden-shifting framework announced

7

in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under

that framework, a plaintiff must first establish a <u>prima</u> <u>facie</u>

case of discrimination.  <u>St. Mary's Honor Center v. Hicks</u>, 509

U.S. 502, 506 (1993).  To make out a <u>prima</u> <u>facie</u> case of illegal

discrimination, a plaintiff must show that (1) she belongs to a

protected class, (2) she performed her job satisfactorily, (3)

she experienced an adverse employment action, and (4) the action

occurred under circumstances giving rise to an inference of

discrimination.  <u>See</u> <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134

(2d Cir. 1997).  If a plaintiff establishes a <u>prima</u> <u>facie</u> case,

the burden shifts to the defendant to present a legitimate,

nondiscriminatory reason for the employment decision in question.

<u>See</u> <u>St. Mary's</u>, 509 U.S. at 507.  If the defendant presents such

a reason, the presumption of discrimination "'completely drops

out of the picture,'" <u>James v. New York Racing Ass'n</u>, 233 F.3d

149, 154 (2d Cir. 2000) (quoting <u>St. Mary's</u>, 509 U.S. at 510-11),

and the burden shifts back to the plaintiff to demonstrate that

the proffered reason is pretext for a true, discriminatory

reason.  <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S.

248, 256 (1981).  Despite the "division of intermediate

evidentiary burdens" announced in <u>McDonnell</u>, the Supreme Court

has specifically noted that "[t]he ultimate burden of persuading

the trier of fact that the defendant intentionally discriminated

against the plaintiff remains at all times with the plaintiff."

Id. at 253.

Assuming arguendo that Pellier can establish the first, second and fourth elements of her prima facie case, BA argues that Pellier has not experienced an adverse employment action and thus cannot meet her initial burden under McDonnell. For her part, Pellier argues that her transfer to the less prestigious WCD position was an adverse employment action.

It is clear that Pellier's transfer cannot serve as an adverse employment action because she voluntarily requested and accepted it. The Second Circuit has adopted the proposition that a voluntary transfer can, under certain circumstances, serve as an adverse employment action. See Richardson v. New York State Dep't of Correctional Services, 180 F.3d 426, 444 n.4 (2d Cir. 1999) (finding sufficient evidence to support a conclusion that a transfer requested by the plaintiff constituted an adverse employment action where there was evidence that another, more desirable, lateral job opening for which the plaintiff was qualified may have existed but was not offered to the plaintiff).[4] However, this circuit has held that a voluntary

<hr />

[4] In a separate opinion in Richardson, then-Chief Judge Winter argued that, as a matter of law, plaintiff Richardson's voluntary transfer request and acceptance should preclude finding an adverse employment action. See id. at 450 (Winter, C.J., concurring in part and dissenting in part). The majority, however, rested its conclusion of an adverse employment action on evidence which indicated that there may in fact have been two positions available for which Richardson was qualified at the time of her request, despite the fact that defendant offered only

resignation is not an adverse employment action unless the employee was constructively discharged. Cf. Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987) (treating resignation as employer-initiated discharge for the purposes of discriminatory discharge claim where supervisor told plaintiff he "would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient performance"). Under the constructive discharge doctrine, a voluntary resignation will not preclude a finding of an adverse employment action if the plaintiff can show that "the employer . . . deliberately [made] working conditions so intolerable that the employee [was] forced into an involuntary resignation." Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983) (quoting Young v. Southwestern Savings and Loan Assn., 509 F.2d 140, 144 (5th Cir. 1975) (internal quotations omitted)). In such circumstances, a plaintiff's resignation is not voluntary at all, but rather is the result of the employer's illegal discrimination. See Terry v. Ashcroft, 336 F.3d 128, 152 (2d Cir. 2003). Indeed, the Supreme Court has held that an employer may be liable under Title VII where an allegedly hostile work environment forces an employee to resign. See Pennsylvania State Police v. Suders, 542 U.S. 129, 143 (2004) ("Title VII encompasses employer liability for a constructive discharge.").

one. See id. at 444 n.4.

Though the Second Circuit has not explicitly applied the doctrine of constructive discharge to situations where an employee accepts a transfer offer, other circuits have so held. See, e.g., Simpson v. Borg-Warner Automotive, Inc., 196 F.3d 873, 876-78 (7th Cir. 1999) (holding that voluntary transfer was not an adverse employment action where the work environment was not intolerable and assessing voluntariness under "constructive discharge" analysis); Fenney v. Dakota, Minnesota & Eastern R. Co., 327 F.3d 707, 717 (8th Cir. 2003) (recognizing constructive demotion in ADA context as adverse employment action and employing constructive discharge analysis under which a plaintiff "must show both that he found the environment to be abusive and that an objective person in his position would have felt that he had to demote himself because of his discriminatory work conditions"). But compare Sharp v. City of Houston, 164 F.3d 923 (5th Cir. 1999) (reversing grant of summary judgment where "[t]he jury could have found that the transfer, albeit at Sharp's request, was a constructive demotion, the involuntary result of conditions so intolerable that a reasonable person would feel compelled to leave").

As there appears to be little doctrinal distinction between claims of forced resignation and claims of forced transfer, the principle outlined in Richardson and by other circuits is persuasive. Pellier's voluntary transfer is not an adverse

employment action unless she can establish that BA intentionally created conditions "'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled'" to accept the transfer.  See Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003) (quoting Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996)); see also Thomas v. Bergdorf Goodman, Inc., 03-CV-3066, 2004 WL 2979960, at *9 n.5 (S.D.N.Y. Dec. 22, 2004) (observing that although Suders constructive discharge as a basis for a Title VII claim, it did not dispense with the intentionality element required by existing constructive discharge case law).  Because she does not meet this burden, Pellier's transfer cannot serve as an adverse employment action and thus her prima facie case fails.

First, the evidence does not support finding that Pellier herself felt compelled to request or accept the transfer. Pellier's own acts prior to accepting the WCD position in August 2002 belie any claim of constructive demotion.  In January 2001, Pellier refused to consider a position offered to her because it would have reduced her pay.  See Defs' App. Ex. EE, FF.  In April 2001, she refused another offered position because BA gave no assurances that it would not be a temporary position.  See Defs' 56.1 Stmt. ¶ 96, Defs' App. Ex. WW.  Again, in June 2002, Pellier refused BA's early retirement package because it included a provision that would have precluded her from pursuing this

litigation.  See id. ¶ 199; Defs' App. Ex. PPP.[5]  Thus, the

conduct of which Pellier complains was not sufficiently

intolerable to compel an unfavorable change in employment as of

June 2002.  Failing to allege some anomalous event or increase in

the inappropriate conduct thereafter, the same conduct which was

not so intolerable in January 2001, April 2001 or June 2002

cannot have been sufficiently intolerable in August 2002 to

constitute constructive discharge, when Pellier alleges she was

forced to accept the WCD position.  See Petrosino v. Bell

Atlantic, 385 F.3d 210, 230 (2d Cir. 2004) (holding that

plaintiff who experienced hostile environment for eight years

without resigning could not show constructive discharge in the

next year where she did not establish that deliberate employer

actions "ratcheted harassment up to the breaking point").

Second, Pellier fails to show that BA intentionally created

the "intolerable" conditions.  Pellier argues that BA's failure

to adequately investigate her complaints illustrates BA's tacit

approval of that conduct.  See Pl's Opp. Mem. at 1-4.  In

support, Pellier asserts that BA "effectively ignored her

complaints" by responding with only "cosmetic band-aid methods."

See Pl's Opp. Mem. at 5.  Something more than "mere negligence or

ineffectiveness" is required to show intentionality on the part

---

[5] BA asserts that this "no-litigation" provision is standard
for all employees who seek early retirement, which Pellier does
not contest.  See Defs' 56.1 Stmt. ¶ 199.

13

of an employer sufficient to give rise to liability for
constructive discharge.  See Whidbee v. Garzarelli Food
Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000) (holding that a
supervisor's ineffective and even incompetent handling of
racially offensive comments and conduct by plaintiffs' co-worker
did "not rise to the level of deliberate inaction required by our
precedent" for employer liability for constructive discharge
where the supervisor expressed an interest in retaining
plaintiffs).  Though the adequacy of BA's investigations may be a
close issue in this case, see infra, they were not so deficient
to conclude that BA "intended to create intolerable workplace
conditions," as required in this circuit.  Id.

        Thus, Pellier's transfer to the WCD position was voluntary
and, therefore, not an adverse employment action, and she cannot
establish a prima facie case of sex discrimination or
retaliation.  However, even assuming arguendo that she could
establish a prima facie case, her sex discrimination claim would
still fail, because BA has presented a legitimate,
nondiscriminatory reason for Pellier's transfer - her request -
which she does not rebut.  See Defs' Mem. at 9-10.

        Once a plaintiff establishes a prima facie case of
discrimination, the burden shifts to defendant to present a
legitimate, nondiscriminatory reason for the employment action in
question.  See St. Mary's, 509 U.S. at 506.  BA rightly contends

that Pellier's request to be transferred discharges their burden.

See Richardson, 180 F.3d at 444 n.4 (observing that transfer request would have been a legitimate, nondiscriminatory reason for the employment action in question); LaBarge Affidavit ¶ 4-5. It should be noted that BA need not persuade the court that it was actually motivated by the proffered reason; it is Pellier who bears the ultimate burden of showing that BA's reason is mere pretext for illegal discrimination. See Burdine, 450 U.S. at 254-55; St. Mary's, 509 U.S. at 510-11. To do so, Pellier must show both that the BA's reason is false and that illegal discrimination was the real reason. See id. at 515. Because she presents no evidence to show that she did not in fact request a transfer, Pellier fails to rebut BA's legitimate, nondiscriminatory reason for transferring her and, thus, her sex discrimination claim must be dismissed.[6]

## b. Hostile Work Environment

### (i) Pellier's perception of the conduct

Pellier also claims that BA should be liable under Title VII

---

[6] Pellier argues that her request cannot serve as BA's legitimate, nondiscriminatory reason because she was forced to request the transfer. Indeed, there would be little justice if an employer could escape liability simply because its illegal behavior prompted an employee to request a transfer. However, because the alleged illegal conduct was not so great as to compel Pellier's transfer request, see supra, this suit does not present that situation.

15

for the conduct of Engineering personnel who allegedly created a hostile work environment. In order to be successful on such a claim, a plaintiff must first show that the conduct which forms the basis of her claim is actionable, viz., the conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). This assessment includes both an objective and a subjective element: "a reasonable person would have to find the environment hostile, and the victim must have subjectively so perceived it." Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir. 1998), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).

BA does not present any argument that the conduct in question does not fulfill the objective or 'sufficiently pervasive' elements of a hostile work environment claim. Instead, BA argues that Pellier did not subjectively perceive the environment as hostile. To support this contention, BA points out that Pellier did not complain about what she now characterizes as inappropriate conduct until several years after she claims it began, and that Pellier never told her subordinates that she was offended by their conduct. See Miquelli Dep. at 117; Dep. of John Reisert ("Reisert Dep.") at 202-04.

Along these lines, BA further argues that Pellier's hostile work environment claim is barred by the doctrine of laches. However, "when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely." Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 260 (2d Cir. 1997). Because Title VII establishes a clear limitations period, and because Pellier's hostile work environment claim was timely filed, laches does not bar her claim. See Petrosino, 385 F.3d at 220 (noting that Title VII hostile work environment claims require only that one representative act have occurred within the 300-day period to state a timely continuing violation claim).

BA also argues that, because some of the inappropriate materials depicted Hutcheson as well as Pellier, Pellier was targeted not because of her sex but rather because she was in a management position. See Defs' Mem. at 16-17. However, Pellier's evidence of inappropriate materials directed solely at her is sufficient to create a question of fact as to whether she was targeted because of her sex. See Pl's 56.1 Stmt. ¶ 56 (u),(x),(z),(ii),(qq),(vv),(hhh),(jjj).

BA also observes that, during her tenure in Engineering, Pellier engaged in conduct similar to that of which she now complains. On this last point, BA offers the following uncontested evidence: Pellier engaged in "over-exuberant hugging

and kissing" with some of the Engineering employees, <u>see</u> Dep. of Douglas A. Marcus, MD, ("Marcus Dep.") at 209;[7] Pellier engaged in conversations of a sexual nature with Engineering employees, including about her teenage sexual history, <u>see</u> Dep. of Thomas Miquelli ("Miquelli Dep.") at 105-08, 121; Pellier flirted with an Engineering employee on one occasion, <u>see</u> Defs' Ex. ZZ (Driscoll and Schulman Investigation Notes); Pellier had intimate relations with two BA employees, one of whom she ultimately got engaged to, <u>see</u> Defs' 56.1 Stmt. ¶¶ 105, 122; and, in response to a sexual remark by one of her colleagues, Pellier stated: "You're going to make me a rich woman, that's at least $50,000 worth of harassment."  Defs' App. Ex. MM (Pellier Diary) at 1128-29.  By this evidence, BA argues that Pellier cannot feign offense to conduct of a sexual nature when, in fact, she herself was comfortable engaging in such conduct.  However, BA's argument fails for two reasons.

First, contrary to BA's assertion, a reasonable jury need not conclude that Pellier was comfortable engaging in sexual behavior at all.  For instance, BA presents Pellier's comment about "$50,000 worth of harassment" as indicating a flip attitude toward sexual harassment and illustrative of Pellier's comfort

[7] Deponent Dr. Marcus appears to have been reading the above-quoted statements from a document written by Pellier.  That document is not before the court, nor is it named or otherwise identified.  Nonetheless, Pellier does not contest the veracity of the above-quoted material.

with sexual innuendo.  However, the full context of that statement, which is set forth in its entirety in the margin, could lead a rational jury to the opposite conclusion.[8]  Indeed, this comment could be interpreted by a jury as Pellier admonishing her colleagues about their inappropriate conduct. Likewise, a reasonable jury could conclude that Pellier's self-styled comfort with flirtation and "over-exuberant hugging and kissing" does not amount to a comfort with the kind of behavior of which she complains: leaving explicit pornography throughout the Engineering facility.  Furthermore, Pellier's consensual romantic relationships with other BA employees are irrelevant.

Second, even if BA's evidence could establish that Pellier was comfortable with <u>certain</u> sexual behavior in the workplace, a reasonable jury need not conclude that she was thereby comfortable with the behavior of which she now complains: being

---

[8] "I went into the breakroom at 1955 and asked Dickie [illegible], who was an [illegible], how Charlie Pandolf was doing.  He said he didn't know [and] that he thought I'd spoken to him but I told him Charlie had spoken to Glyn Bowen.  Dickie said 'I heard he grew a new vein in his heart and he'll be back to work tomorrow.'  Charlie [illegible] chimed in 'I've been trying to grow myself a new vein in my dick for 20 years now.' Tommy Miqueli said 'You'd better be careful, Liz [Pellier] is here.'  Charlie [illegible] said 'I know, and I told her the same thing yesterday, but she just walked away.'  With that, I stopped and looked at him and said 'I heard you yesterday and today and you're going to make me a rich woman, that's $50,000 worth of harassment.'  Tommy Miqueli said 'You're right, Liz, he's disgusting.'  Everyone laughed and I walked back to the Ops desk to be confronted with some obscene animated cartoon that Warren and Anthony D'Erasmo were watching on the Ops computer.  It seems worse, it seems as if they're doing it on purpose now."  Defs' Aff. Ex. MM at 1128-29.

singled out by an all-male staff as the lone target of sexually explicit materials.  See Pl's 56.1 Stmt. ¶ 56 (u), (x), (z), (ii), (qq), (vv), (hhh), (jjj).  Indeed, it is one thing to tolerate, or even engage in, the boorish behavior of one's co-workers; it is wholly another thing to become the butt of such behavior, especially where she is the only female involved. Because BA has not presented evidence from which a jury would be forced to conclude that Pellier was not subjectively offended by the conduct of her Engineering colleagues, that question is properly left for a jury to decide.

**(ii) BA's response to Pellier's complaints**

Once she demonstrates actionable conduct, a plaintiff must also impute such conduct to her employer for liability to attach. See Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). In this case, the appropriate standard for imputing conduct to BA is that governing a co-worker's conduct.[9]  An employer will be

---

[9] In her complaint, Pellier points to one instance where Hutcheson "made comments about female buns," Plaintiff's First Amended Complaint ("Pl's Compl.") ¶ 26, though Pellier appears to abandon this allegation in her briefing and supplementary materials.  Nonetheless, one isolated incident of harassment is not sufficient to make Hutcheson responsible for creating a hostile work environment.  See Tomka, 66 F.3d at 1306 n.5 (noting that "isolated remarks or occasional episodes of harassment will not merit relief under Title VII").  Because plaintiff makes no other claim of supervisor harassment, the affirmative defense to supervisor harassment invoked by defendants need not be reached. See Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Pennsylvania State Police v. Suders, 542 U.S. 129, 143 n.6 (2004)

liable for the hostile work environment created by a plaintiff's
co-workers if "the employer failed to provide a reasonable avenue
for complaint or ... knew, or in the exercise of reasonable care
should have known, about the harassment yet failed to take
appropriate remedial action." Fairbrother v. Morrison, 412 F.3d
39, 52 (2d Cir. 2005) (citations and internal quotations
omitted); Kotcher v. Rosa and Sullivan Appliance Center, Inc.,
957 F.2d 59, 63 (2d Cir. 1992). That standard is essentially a
negligence standard: "[a]n employer that has knowledge of a
hostile work environment has a duty to take reasonable steps to
remedy it." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 65 (2d
Cir. 1998); see also Richardson, 180 F.3d at 441; Snell v.
Suffolk County, 782 F.2d 1094, 1104 (2d Cir. 1986).[10]  To
determine whether an employer's response is reasonable, courts
should consider the totality of the circumstances, taking into
consideration such factors as the gravity of the harm, the nature
of the work environment and the resources available to the
employer. See Distasio, 157 F.3d at 65.

The record indicates that Pellier's initial complaints to
Hutcheson and Rogers elicited little more than Hutcheson's
assurance that "if we can ever find the culprit he would [sic] be
disciplined." Pl's App. Ex. R (E-Mail Transcripts). On

("Ellerth and Faragher expressed no view on the employer
liability standard for co-worker harassment. Nor do we.").

[10] It is undisputed that BA had an anti-harassment policy.

21

subsequent occasions, Hutcheson's responses included asking the Engineering DMMs for information about who was responsible for the inappropriate conduct, <u>see</u> Defs' App. Ex. LL. (E-Mail Transcripts), posting memoranda reiterating BA's anti-harassment policy on a public bulletin board, <u>see</u> Defs' App. Ex. JJ (Hutcheson Memorandum), warning staff that anyone caught acting inappropriately would be disciplined, <u>see</u> <u>id.</u>; Pellier Dep. at 189, and personally inspecting the Engineering facility for inappropriate materials. <u>See</u> Hutcheson Dep. at 111-12, Pellier Dep. at 391.

These types of responses continued after Pellier filed her complaint with the EEOC in late May 2001, <u>see</u> Defs' App. Ex. OO (E-Mail Transcript), and Rogers conducted a "walk-through" inspection of the Engineering premises. <u>See</u> Defs' App. Ex. MM (Pellier Diary) at 1137. Driscoll also scheduled mandatory anti-harassment and sensitivity training sessions that took place between July 30 and December 20, 2001 for all Engineering staff. <u>See</u> Defs' App. Ex. P (Record of Engineering Diversity Awareness Training). In addition, Driscoll and Virginia Schulman, BA's Manager of Employee Relations, met with Pellier to discuss her EEOC complaint and interviewed Rudowitz, Rogers and Hutcheson in connection therewith. <u>See</u> Defs' App. Ex. MM at 1143. Thereafter, in response to one complaint about inappropriate use of a television in a common-area, Hutcheson removed the television, VCR and cable equipment altogether. <u>See</u> Defs' App.

Ex. QQ (E-Mail Transcripts); id. at Ex. RR (Hutcheson

Memorandum). Hutcheson also had an employee in BA's Information

Technology department verify that the appropriate internet

security measures were in place on all the Engineering computers.

See Dep. of Mohammed Nabi ("Nabi Dep.") at 65-66, 102.

On August 22, 2001, Pellier filed a supplemental complaint

with the EEOC, and Driscoll and Schulman again interviewed

Pellier and Hutcheson regarding these new allegations. See Defs'

App. Ex. DDD (Driscoll and Hutcheson September 6, 2001 Meeting

Notes). Soon thereafter, Hutcheson received another complaint

about pornographic material in Engineering from another (male)

employee. See Hutcheson Dep. at 117-18. In response, Hutcheson

initiated a formal investigation under the terms of the

collective bargaining agreement between BA and the union staff in

Engineering. See Defs' App. Ex. GGG (Hutcheson Memorandum).[11]

That investigation entailed interviewing and taking writing

---

[11] The terms of a collective bargaining agreement between BA
and the International Association of Machinists and Aerospace
Workers ("IAMAW") prescribe limits on BA's ability to investigate
and discipline union employees. If BA wishes to formally
discipline union employees for suspected violations of BA policy,
it must initiate an investigation within ten days of receiving
notice of such violations and must formally notify IAMAW of the
investigation. See Rudowitz Dep. at 69, 71. BA can investigate
the incident for ten days, after which it may request a twenty
day extension from IAMAW. See id.; Driscoll Dep. at 234. If the
investigation does not determine who is responsible for that
particular violation at the expiration of the investigation
period, no union employee may be disciplined. See Rudowitz Dep.
at 72. Nor may a union employee be disciplined if the above-
described timetables are not followed. See id.

samples from every Engineering staff member.  <u>See</u> Defs' App. Ex. JJJ (Driscoll Interview Notes); Driscoll Dep. at 222.  Though that investigation did not reveal who was responsible for bringing inappropriate materials into Engineering, <u>see</u> Defs' App. Ex. NNN (Hutcheson Memorandum); Driscoll Dep. at 37, several Engineering staff members who admitted to engaging in other inappropriate conduct were verbally disciplined.  <u>See</u> Hutcheson Dep. at 231-32; Driscoll Dep. at 33.  On at least one occasion in April 2002, after the completion of the above investigation, Pellier again complained of inappropriate material that had been left in her mail tray.  <u>See</u> Defs' App. Ex. RRR (Inappropriate Material and Pellier Notes).  In response, BA installed surveillance equipment throughout the Engineering facility.  <u>See</u> Hutcheson Dep. at 252, 256-58; Rudowitz Dep. at 228-29. Thereafter, in August 2002, Pellier accepted a transfer to the WCD position.  <u>See</u> Pellier Dep. at 20.

In light of the foregoing, a jury could conclude that BA's responses were timely and adequate given the gravity of the harm and the nature of Pellier's complaints.  However, this court cannot say as a matter of law that no jury could conclude otherwise.  Because there remains a question of fact as to whether BA took reasonable steps to remedy the conduct of which Pellier complained for over two years, BA's motion for summary judgment is denied insofar as it seeks to dismiss Pellier's hostile work environment claim.

## c. Retaliation

Pellier also claims that BA retaliated against her for complaining about the inappropriate conduct of Engineering personnel. This claim is governed by the <u>McDonnell Douglas</u> burden-shifting framework and thus Pellier must establish, <u>inter alia</u>, that she experienced an adverse employment action. <u>See</u> <u>Reed v. A.W. Lawrence & Co., Inc.</u>, 95 F.3d 1170, 1177-78 (2d Cir. 1996). Because, as already discussed, Pellier's transfer to the WCD position was not an adverse employment action, it cannot serve as foundation of her retaliation claim.

Nonetheless, "[a]n adverse employment action can be proved by showing that the employer 'knew but failed to take action to abate retaliatory harassment inflicted by co-workers,' and such harassment constituted a 'materially adverse change in the terms and conditions of employment.'" <u>Brunson v. Bayer Corp.</u>, 237 F. Supp. 2d 192, 205 (D.Conn. 2002) (quoting <u>Richardson</u>, 180 F.3d at 446). In this vein, Pellier claims that her co-workers engaged in harassing behavior in reaction to her complaints about inappropriate conduct and that the harassment materially affected the terms of her employment. Specifically, Pellier notes that after Hutcheson removed the television equipment in Engineering, someone posted a fake memorandum, purportedly from Hutcheson, which implied that Engineering staff members had been driven to cannibalism by virtue of the television's absence. <u>See</u> Pl's App. Ex. GG (False Memorandum). Pellier points to another occasion

when an article was posted in a public space in Engineering entitled "The Tyranny of the Politically Correct."  See Defs' App. Ex. MM at 1148.  Pellier also points to two other placards posted in Engineering: one stated "Sex Posters Branded," see Pl's App. Ex. MM (Poster); another stated "Behave or I'll Chop Your Bits Off," and depicted a woman holding a pair of scissors over whom Pellier's name had been hand-written.  See Pl's App. Ex. NN (Poster).  She further alleges that she was not included in critical management/DMM operation meetings and that one of her principal duties of scheduling "compensatory-time-off days" and vacations was taken away from her.  Pellier Aff. ¶ 18.  She continued to find pornography and offensive pictures in Engineering after she filed her EEOC complaints, some of it directed at her.  For example, on April 13, 2002, she discovered a drawing of a naked woman bent over with a man behind her wearing a dildo on his forehead.  The name "Liz" appeard over the female figure and the name "Doug" appeared above the male figure.  Pellier Aff. ¶ 24; Pl's App. Ex. AAA.  Pellier alleges that no investigation or action was taken with respect to these incidents.  Pellier Aff. §§ 21-24.

The Second Circuit has adopted the view that "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action."  Richardson, 180 F.3d at 446.  However, "because there are no bright-line rules, courts must pore over each case to determine whether the challenged

employment action reaches the level of 'adverse.'" <u>Id.</u> (quoting

<u>Wanamaker v. Columbian Rope Co.</u>, 108 F.3d 462, 466 (2d Cir. 1997)

(internal quotations omitted).  In <u>Richardson</u>, the Court held

that the plaintiff had alleged facts to support a retaliation

claim based on unchecked retaliatory harassment by her co-workers

where she alleged that they had left manure in her parking space,

hair in her food, shot a rubber band at her head and scratched

the paint on her car after she complained of racial harassment.

<u>Id.</u> at 446-47.

It is true that some of the post-EEOC complaint activities

Pellier complains of – such as the pornography in the workplace

that was not specifically targeting Pellier – are similar in

character to the pre-EEOC complaint activities that comprise her

hostile work environment claim.  But certain of the post-

complaint activities evidence an awareness by Pellier's co-

workers of her complaints and an intent to punish her for them.

The instances of retaliatory harassment cited by Pellier are

sufficiently similar in severity to those alleged in <u>Richardson</u>

that her claim for retaliation cannot be dismissed on summary

judgment for failure to state a <u>prima facie</u> claim.


**d. Conclusion**

For the foregoing reasons, BA's motion for summary judgment

is granted with respect to Pellier's claim of sex discrimination,

and denied with respect to Pellier's claims of hostile work

environment and retaliation in violation of Title VII.

### (2)

### State and Local Claims

Pellier also brings claims against all defendants for illegal discrimination, retaliation and harassment under New York State and City civil rights statutes. See N.Y. Exec. § 296(1),(6) (McKinney 2005) ("NYSHRL"); New York, N.Y. Admin. Code Tit. 8, ch. 1, § 8-107 (West 2004) ("NYCHRL"). As discussed above, Pellier has not experienced cognizable illegal discrimination under Title VII. Because discrimination and claims under the NYSHRL and the NYCHRL involve the same analysis as that which governs such claims under Title VII, see Mack v. Otis Elevator Co., 326 F.3d 116, 122 n.2 (2d Cir. 2003); Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000), Pellier has likewise not experienced cognizable illegal discrimination or under the state and city laws. The only question that remains, therefore, is whether summary judgment should be granted with respect to Pellier's NYSHRL and NYCHRL hostile work environment and retaliation claims.

### a. Claims Against BA

Generally the "consideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims." Mack, 326 F.3d at 122 n.2 (quoting Cruz v.

28

Coach Stores, Inc., 202 F.3d at 565 n.1) (internal quotation marks omitted).  With respect to a claim of hostile work environment under the NYSHRL, "[i]t has been well documented, by both federal courts within the Second Circuit and by New York state courts, that employer liability under NYSHRL is not judged under respondeat superior, but instead requires a more stringent showing, in particular, that the employer had knowledge of and acquiesced in, or subsequently condoned, the discriminatory conduct."  Bennett v. Progressive Corp., 225 F. Supp. 2d 190, 210 (N.D.N.Y. 2002).  Because the inquiry into whether an employer's inaction amounts to acquiescence is ultimately a question reasonableness under the NYSHRL (as it is under Title VII), courts have recognized that the "more stringent showing" required under the NYSHRL relates solely to an employer's awareness of inappropriate conduct.  See Duviella v. Counseling Service of Eastern Dist. of N.Y., No. 00-CV-2424, 2001 WL 1776158, at *16 (E.D.N.Y. Nov. 20, 2001) ("[E]mployer liability under the [NYS]HRL is very similar to the [Title VII] test, except that actual notice, rather than constructive notice, appears to be required under the [NYS]HRL."); see also State Division of Human Rights ex rel. Greene v. St. Elizabeth's Hosp., 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411, 412 (1985); Father Belle Community Center v. State Division of Human Rights ex rel. King, 221 A.D.2d 44, 54-55, 642 N.Y.S.2d 739, 746 (4th Dep't 1996) ("Condonation may be disproved by a showing that the employer reasonably

investigated a complaint of discriminatory conduct and took corrective action.").

BA's awareness is not an issue in this case; threfore, the federal and state standards are essentially identical. Because, as discussed above, the reasonableness of BA's responses to Pellier's complaints is properly a question for the jury, summary judgment on her NYSHRL and NYCHRL hostile work environment and retaliation claims is similarly inappropriate at this stage.

### b. Claims Against Individual Defendants[12]

Individuals may be held liable under two provisions of the NYSHRL. The first of these provisions makes it unlawful for an "employer" to discriminate on the basis of sex. _See_ N.Y. Exec. § 296(1). The second makes it illegal for "any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." _See_ N.Y. Exec. § 296(6). Like its New York State counterpart, the NYCHRL

---

[12] Defendants correctly argue that Driscoll was not named in Pellier's EEOC complaints and, therefore, cannot properly be included in this action because all administrative remedies as to him have not been exhausted. _See_ Defs' Mem. at 23 n.14 (citing Ganthier v. North Shore-Long Island Jewish Healthy System, 298 F. Supp. 2d 342, 347 (E.D.N.Y. 2004)); _see_ _also_ Gagliardi v. Universal Outdoor Holdings, Inc., 137 F. Supp. 2d 374, 379 (S.D.N.Y. 2001) (stating that in cases brought pursuant to the ADEA, a "defendant [must be] given notice of the alleged violation and an opportunity to voluntarily remedy the situation before the plaintiff resorts to filing a complaint in federal court."). For this reason, summary judgment must be granted with respect to any claims against Driscoll in his individual capacity.

also contains two provisions under which individuals may be held liable. The first makes it illegal "[f]or an employer or an employee or agent thereof, because of the . . . gender . . . of any person . . . to discriminate against such person in compensation or in terms, conditions or privileges of employment." See N.Y. Admin. Code Tit. 8, ch. 1, § 8-107(1). The second makes it illegal "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under the [NYCHRL]." See N.Y. Admin. Code Tit. 8, ch. 1, § 8-107(6).

Turning first to the aiding and abetting provisions of the NYSHRL and the NYCHRL, "[t]he same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is virtually identical," Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004) (citation and internal quotation marks omitted), and those claims will be considered in tandem. The Second Circuit has noted that aiding and abetting liability will only attach where an employee "'actually participates in the conduct giving rise to a discrimination claim.'" Id. at 157-58 (quoting Tomka, 66 F.3d at 1317). Because Pellier does not allege that the individual defendants "actually engaged" in the conduct which created the hostile work environment, see supra, her claims against the individual defendants for aiding and abetting under the NYSHRL and the NYCHRL must be dismissed.

Returning to the NYSHRL, state law also prohibits an

31

"employer" from engaging in illegal discrimination.  See N.Y.

Exec. § 296(1).  The companion NYCHRL provision prohibits such

conduct from "an employer or an employee or agent thereof."  N.Y.

Admin. Code Tit. 8, ch. 1, § 8-107(1).  Therefore, while the

individual defendants clearly fall within the scope of the NYCHRL

prohibition, there remains a threshold question whether they fall

within the NYSHRL prohibition.  Addressing that question, the New

York Court of Appeals has held that an employee is not considered

an "employer" for the purposes of the NYSHRL "if he [or she] is

not shown to have any ownership interest or any power to do more

than carry out personnel decisions made by others."  Patrowich v.

Chemical Bank, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 660 (1984).

The Second Circuit has interpreted this statement to preclude

individual liability where the employee defendant did not aid and

abet the discrimination unless an employee has authority to hire

or fire other employees.  See Tomka v. Seiler Corp., 66 F.3d at

1317; see also Heinemann v. Howe & Rusling, 260 F. Supp. 2d 592,

595 (W.D.N.Y. 2003) (holding that committee members who

collectively had power to make employment decisions concerning

plaintiff could be held liable under the NYSHRL); Perks v. Town

of Huntington, 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003) (Young,

J.) (finding no liability under § 296(1)for individual defendant

whose demand for plaintiff's resignation did not result in

plaintiff's termination).  The parties agree that, of all the

individual defendants, Rudowitz alone had the power to hire and

fire.  See Pl's 56.1 Stmt. ¶¶ 16, 21-22, 28; Defs' Reply 56.1
Stmt. ¶¶ 16, 21-22, 28.  Therefore, while all individual
defendants fall within the NYCHRL's prohibition, only Rudowitz
may potentially be held liable under the NYSHRL.

As noted above, the standard for attributing liability for a
hostile work environment and for retaliation under the NYSHRL and
the NYCHRL in this case is essentially identical to that
governing Title VII claims; defendants will be liable if they
failed to take reasonable steps to remedy the conduct of which
Pellier complained.

The record indicates that Pellier complained directly to
Rudowitz on one occasion.  See Rudowitz Dep. at 83-84; Pellier
Dep. at 225.  In response, Rudowitz immediately contacted
Hutcheson and told him to take appropriate remedial measures.
See Rudowitz Dep. at 88.  Pellier also complained to Rogers on at
least one occasion.  See Rogers Dep. at 70-71; Pellier Dep. at
387.  Though Pellier asked Rogers not to make "a big fuss" about
that complaint, see Defs' App. Ex. GG (Pellier's Notes); Rogers
Dep. at 57, Pellier alleges that Rogers failed to respond in any
way until Pellier filed her EEOC complaint and that, when Rogers
did respond, she forewarned the Engineering staff of her
impending inspection.  See Pl's 56.1 Stmt. ¶ 56(d).  Furthermore,
as noted above, Pellier complained to Hutcheson on numerous
occasions, to which he invariably responded with allegedly
inadequate informal investigations and reiterations of company

policy.  See Pl's 56.1 Stmt. ¶¶ 56(e)-(f), (h), (n), (s)-(u).
While the responses of certain individuals, especially those of
Rudowitz, might have been reasonable given the nature of
Pellier's complaints, a reasonable jury could disagree.  For
instance, a reasonable jury could conclude that defendants'
failure to immediately initiate a formal investigation indicates
an unreasonable response to Pellier's complaints.  Ultimately,
the question of reasonableness under the circumstances cannot
properly be foreclosed by this court.

## c. Conclusion

For the foregoing reasons, defendants' motion for summary
judgment is granted as to Pellier's claims against the individual
defendants for aiding and abetting under the NYSHRL and NYCHRL;
her claims against Rogers and Hutcheson under NYSHRL § 296(1);
and all her claims against Driscoll.  It is denied as to
Pellier's claims against Rudowitz, Rogers and Hutcheson under the
NYCHRL and her claims against Rudowitz under the NYSHRL.

### (3)

### Pellier's Remaining Claims

Pellier claims that all defendants should be liable for
violations of New York State's surreptitious viewing law, see
Gen. Bus. Law § 395 ("§ 395"), and for common-law intentional

34

infliction of emotional distress ("IIED").  Pellier bases these claims upon the fact that defendants installed a surveillance camera in her shared office.  Pellier alleges that defendants knew she used her office to change clothes, and indeed forced her to do so by failing to provide adequate female changing facilities.  She claims that this foreknowledge, together with defendants' failure to notify her of the equipment installation, indicates that the cameras were an attempt to "capture her in an indiscreet moment."  <u>See</u> Pl's Opp. Mem. at 24.  There are several problems with Pellier's claims.

As a preliminary matter, § 395 does not create a private right of action for violation of its provisions, <u>see</u> <u>Dana v. Oak Park Marina, Inc.</u>, 230 A.D.2d 204, 208, 660 N.Y.S.2d 906, 909 (4th Dep't 1997), and, thus, Pellier's claim for damages predicated thereupon must be dismissed.  Nonetheless, New York courts have held that § 395 creates a statutory duty which may serve as the basis for common-law negligent and reckless infliction of emotional distress claims.  <u>Id.</u>  However, Pellier's common-law claim, which proceeds under the theory of <u>intentional</u> infliction of emotional distress, encounters significant hurdles that it cannot overcome.

First, it is unclear whether the duty created by § 395 inheres in this situation.  The statute prohibits placing a viewing device in "the interior of any fitting room, restroom, toilet, bathroom, washroom, shower, or any other room assigned to

35

guests or patrons in a motel, hotel or inn." <u>See</u> Gen. Bus. Law §
395-b (2-a).  The corresponding duty sounding in tort is designed
"to protect persons . . . who are surreptitiously viewed while
lawfully utilizing the described facilities." <u>See</u> <u>Dana</u>, 230
A.D.2d at 208, 660 N.Y.S.2d at 909.  Defendants argue that
Pellier was not using one of the enumerated facilities and that,
as a matter of course, defendants have no duty under § 395 to
refrain from surreptitiously viewing her.  Moreover, defendants
contest Pellier's claim that she was forced to change in her
office by counter-alleging that her job required only that she
don and remove safety clothing designed to fit over her street
clothes.  Inasmuch as Pellier's activities deviate from the use
of her office mandated by her employment, defendants contend that
her activities are not lawful, protected uses.

However, even assuming <u>arguendo</u> that § 395 does create a
duty in this case, Pellier's claim must be dismissed because the
conduct which she alleges is not severe enough to allow recovery
for IIED.  In order to state a claim for IIED, a plaintiff must
allege conduct "so outrageous in character, and so extreme in
degree, as to go beyond all possible bounds of decency, and to be
regarded as atrocious, and utterly intolerable in a civilized
community." <u>Murphy v. American Home Products Corp.</u>, 58 N.Y.2d
293, 303, 461 N.Y.S.2d 232, 236 (1983); <u>Howell v. New York Post
Co., Inc.</u>, 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 353 (1993).
Pellier does not meet this burden as a matter of law.  The facts

show that Pellier's alleged ignorance about the camera installation was instead ignorance only as to the exact location of the cameras.  Indeed, the evidence demonstrates that Pellier knew the cameras would be installed and knew that their installation was an effort to curtail the conduct of which she complained.  In light of these circumstances, defendants' conduct can hardly "be said to exceed all bounds usually tolerated by decent society."  <u>Misek-Falkoff v. Keller</u>, 153 A.D.2d 841, 842, 545 N.Y.S.2d 360, 362 (2d Dep't 1989) (citation and internal quotation marks omitted).  Accordingly, plaintiff's § 395 and IIED claims are dismissed.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part.  It is granted as to (1) Pellier's sex discrimination claims against BA under Title VII, NYSHRL § 296(1) and NYCHRL § 8-107(1); (2) her claims against the individual defendants for aiding and abetting under the NYSHRL and NYCHRL; (3) her claims against Rogers and Hutcheson under NYSHRL § 296(1); (4) all her claims against Driscoll; (5) her claims under § 395 and (6) her intentional infliction of emotional distress claim.  Defendants' motion is denied as to (1) Pellier's hostile work environment and retaliation claims against BA under Title VII, NYSHRL § 296(1) and NYCHRL § 8-107(1); (2) her claims against Rudowitz, Rogers

and Hutcheson under the NYCHRL and (3) her claims against

Rudowitz under the NYSHRL.


Dated:     Brooklyn, New York
           January 17, 2006

                              ORDERED:

                              _____/s/_____
                              David G. Trager
                              United States District Judge